Good morning, Judge Persin, Judge Paez, and Judge Behr. I'm Stephanie Meade, appearing for Johnny Felix Tallabas, the appellant. Your Honors, I know you probably have some questions, so would you like to direct me to whichever argument you would like me to do first? Sure. Just let me proceed. Thank you. First, I'd like to concede and at least address the issue that I did raise an equal protection argument as the basis for suppression. I was just really hoping that that would be something that could abundantly happen, although I think the Supreme Court opinions in Wren really limits that. I thought with Chavez and Nichols that perhaps I could segue in, and I was trying to change the analysis a little by hoping the Court could just get rid of the provision of using nationality as the basis for the stop and then weigh the evidence with what was left, but I have to concede I really don't think we can do that in Wren because of Wren. So moving along, if the Court has no questions about that issue, I'll go to my next one. Thank you. Your Honors, I think the first thing in this case that I believe is essentially important is I do believe that the suppression motion in this case should have been granted. Whether you use the analysis of Artevisu or the trial court's analysis in Tian, I believe that there was still insufficient evidence on the facts of this particular case to stop Mr. Tallabas and to search him under the circumstances. I've delineated the reasons I believe that to be, but essentially what you had was a weighed-down vehicle, a truck in an area where trucks are used to do construction and so forth. The testimony that was used by Ranger Anton in this case, which was the ---- Wait a minute. That really isn't all. You want to tick off the things that created reasonable suspicion because you have it, and I assume you don't expect us to buy what you just said as being all the things there are. No, I don't. No, I don't, Your Honor. You don't have to tick them off. We'll get them. That's okay. Your Honor, I delineated in my brief that Ranger Anton had inconsistent statements. Ranger Anton talked about an experience of watching the Martinez complex. It's a jury trial, right? Yes. It was a jury trial, yes. So what difference does it make? The jury found beyond a reasonable doubt there was enough that he said that, in fact, was consistent. And, indeed, there is enough that he said that is consistent. I believe the standard is different, Your Honor. I mean, when the trial court was ---- It is different in the trial court than it is here? Well, the standard is different in the trial court because the trial court has to decide whether or not there was a reasonable suspicion. But the motion to suppress was filed before the trial, correct? Yes, sir. And there was an independent determination made at that point before the case got ---- And our review is de novo on the question of suppression. Right. Is that right? That's my belief. Right. Okay. So taking Judge Baer's suggestion, there were more ---- there was more here than you started off with, which was, as I understand it, what the officer saw was this truck pulling out from this area that had been ---- that was known to them was a place where there had been illegal alien activity. Well, the problem with that, Your Honor, that is what Ranger Antone testified to. And if you, in looking at the record, what you would notice is Ranger Antone gave vastly different amounts of time of where he saw this so-called illegal activity. First of all, he said, oh, well, the Martinez compound ---- Credibility, though, isn't ---- I don't think we substitute our judgment for the district court's credibility findings. But your judgment is contingent upon believing Ranger Antone to some degree. And there was sufficient indication in the record that Ranger Antone did give information which was vastly different. But there's no dispute, though, that he saw this truck pull out from this area, correct? Correct. There's no dispute that he saw a truck ---- And is there a dispute in the facts that this area was sort of known, a place of where there had been in the past there had been some illegal alien drug activity? And where he had gone from time to time and seen and arrested people who were involved in immigration fraud. Isn't that what the record says, that Antone had been there before? He knows this compound well? Well, Ranger Antone, Your Honor, did say they knew the compound well. But then he gave information that should have raised doubt to this Court about whether or not he was really being genuinely factual. I have a jury question. If you don't like some of it, you can throw it all out, right? No, no, no, Your Honor. You're relying on the credibility of an agent who comes before the Court. And so the Court needs to weigh that in deciding whether or not the information that agent provides is really something the Court can rely on. So, well, the bottom line, though, as I understand, at least on this part of it, is you would agree, I think, that it's fairly undisputed in the record that this was an area that was known to have some prior activity of alien, illegal alien activity, correct? And or drug activity? And or drug activity. It was a known area. Ranger Antone says so. He sees him pulling out from this compound area onto the highway. But there's a road next to that that is commonly used by the people that live there. And that's an important point. There is a road right next to it. The House's other point was that these people didn't live there. Well, the problem is the female that was in the vehicle did. Well, the car didn't live there. Correct. So he pulls out and follows him. And then he calls on the truck, calls his buddy on the phone or whatever, and says, hey, check out this truck. Check out this license. Comes back that the license is registered. The address, I gather, is in another county 100 miles away. That's true. Correct. And he says, oh, this is unusual. But it isn't unusual, and that's the problem. Well, in his own mind, you know, and he's ‑‑ That's my problem with the whole equal protection thing that I can't really ‑‑ He knows this area. Correct? He knows the area. He says he does, yes. Well, he's an officer for the nation, right? Your Honor, he's an officer for the nation, but that's the problem with his inconsistent statements. He talks about primarily he's an environmental ranger. And then if he sees something illegal, he's supposed to phone it in to another agent. And some of the questions I asked him were, well, you say they're environmental. You say that illegal aliens are transported through here and drug transportation and so forth. But then I asked him specific questions. Did you see anything around the compound that looks like illegal aliens are there? Did you see broken foliage? Did you see refuse? Did you see camping? These sorts of things. There was no physical indenture at all that any of that was really going on. And this reputation of the Martinez compound, where although Ranger Anton said he's lived there and he knows all about it, if you believe him, nobody in all the years, 40 years he's lived on the rest, ever has had a vehicle that lives in this compound of I think it was eight houses. There's no vehicles in the Martinez compound ever. He said he didn't drive a vehicle. He said he didn't know that they owned vehicles. That's right, Your Honor. I'm sure that's unusual either. Well, it is on the reservation. And when you're saying it's a compound where you watch this place all the time, this family's been there, according to Ranger Anton, 40 years. And he knows all the vehicles. See, that's why he pulled this one over, because he knew it wasn't one of the Martinez's vehicles. Right, because it came registered in Tucson. Right. But I said, well, so which vehicles are the Martinez vehicles? I mean, I don't really believe that when you read his testimony that he really can support that. So the issue is there is a road used by the locals. The female in the vehicle was one of the locals. And Ranger Anton – He didn't know that at the time he saw the vehicle. No, but he did agree, Your Honor. He did agree that commonly trucks are used in that area. Well, look at the information they had, you know, that they were aware of at the time they made the stop. The information was that Sergeant Anton said a heavily laden vehicle with a Maricopa City by Phoenix, Arizona, Maricopa City registration, had left the Martinez compound. It was heavily laden. He couldn't see anybody or anything in the back of the truck. That's basically it. No traffic violations, no furtive actions, nothing else. The fact that it left near the Martinez compound where there is regularly used roads that the locals use and the construction people use. And many of the construction people are – So he saw it leave the Martinez compound or he only saw it near the Martinez compound? I believe he said he saw it leave the Martinez compound, but the road that was testified to by Odelia Stevens, who was the passenger, I believe is essentially the road that – there's a back road that they use. So this came up at trial. There's the main road and there's a back road that not only do the locals use, but people doing construction on the res that other people use. And that comes out right where the Martinez compound hits the road. It's the same highway. The locals use it. There's still a difference between seeing somebody on that road and seeing somebody come out of there. Please review the record, but my understanding is I believe the road that comes out of the Martinez compound is the same. By the way, were there photographs and maps of the area that were admitted into evidence at the time of the hearing? I don't remember if they were at the time of the hearing. We did have maps at the time of trial. Well, I'm concerned about what was before the district court judge when he made this ruling. Actually, no. I don't believe we did because one of the arguments, now that you mention it, Your Honor, that I remember bringing up was that one of the material witnesses had talked about being under this trailer and that they were waiting for a truck to come and they were under this trailer. And I believe one of the issues that came up in the suppression hearing was that there was no trailer. The government did not bring any proof of a trailer. So there was some credibility issues in our examination of the material witnesses about whether they really came out of this so-called trailer or whether it was a different area. And so, no, I don't believe we had any photos at that time. But I think the bigger issue that I was concerned about, and maybe this Court disagrees with me, is that when you look at what Ranger Anton said as far as why he thought the Martinez compound was suspicious, he went from a lot of criminal activity that he cited, and then when I broke down the numbers it came down to one or two incidents a year, and then he had no independent position. Oh, that's true. But as Judge Pius says, it seems to me that that's the kind of facts in which we do have to defer to the district court. Okay. In other words, that the district court essentially believed that at whatever level, you know, that the fact that he certainly equivocated as to how much direct involvement he had with criminal activity there, that he had enough to state that there was criminal activity of this particular kind. Well, I would agree with you, Your Honor. I think my Achilles heel in this is that I really believed in everything that happened in the examination, is that Ranger Anton primarily and strongly was really pulling over Mr. Tayabas because of the Maricopa County. I'm doing what? I'm sorry? I really believe that Ranger Anton was really initiating the stop on Mr. Tayabas, the appellant, primarily because of his Maricopa registration on his truck. But they also said, the other officer said that they have to pick up three Phoenix cars a night in the area, so they must stop an awful lot of Phoenix. Anybody who comes down here in Phoenix has a problem. Well, that's my concern. I mean, the other, Sergeant Robledo was the other officer in the case, and his argument was, well, you know, sometimes cars are stolen, so if they come through here, they might be stolen from Phoenix. People bring cars from Phoenix through here to avoid being detected essentially on the way to Mexico. I mean, that was the gist of his argument. But they ran a check on this vehicle. This vehicle came back fine. It did not come back as stolen. So between Sergeant Robledo saying, well, you know, it's a Phoenix vehicle, so we check it out, and we check it out to see if it's stolen. He wasn't stopping it because he thought it was stolen. There was no indication of it being stolen. He was stopping it because Ranger Anton told him it was from the Martinez compound area and it was heavily laden, and that was about it. But it had this Maricopa plate to it. So this is the case that supports your argument here today. I mean, if you were to say, Judge, what's your best case? Post a reso. Pardon me? Post a Supreme Court's reso or a reso case. That's the problem why I conceded. The catch-22 is these go together. If I remove the Maricopa issue from my suppression issue, my suppression issue is not very strong, but I really can't argue the issue of the equal protection. So that's why I conceded that in beginning of my argument. And I think it does weaken the suppression issue. But essentially, when you heard the testimony or reviewed the testimony, it does appear that Ranger Anton really was. My own sense of the case is that without the Martinez compound, it would be extraordinarily thin, even given the low standards. The question is whether the Martinez compound is enough to push it over a relatively low level. And I understand your concern with the quality of the evidence about the compound, but that I'm not sure is our problem. I think that's it. I thought Sergeant Robledo's testimony is based on the quicksand of Ranger Anton. If Ranger Anton had been a better witness about his accuracy, I wouldn't be raising this. Didn't Robledo also say that he himself knew that this place was a center for illegal smuggling? I believe Sergeant Robledo did say that he had seen it. You know, Martinez knew it, but he said everybody knew that. It was just sort of common knowledge. I mean, the real question is, if it's common knowledge, why don't they go search the place and deal with it? Exactly. And that's why I raised the questions with Ranger Anton about the actual situation of what the Martinez compound looked like, the number of vehicles that come out of there. If he's so familiar with the vehicles of the Martinez compound, how come he can't name any? But I'll leave that to this Court's discretion. You've reviewed it, you know. You understand those issues. Are you going to briefly address the minor role issue? Which part of you? Minor role issue. I can't hear you. Minor role. Sentencing. Yes, I'd like to. May I? What about the fact, before you get there, doesn't it seem to you that the fact that it was 20 or 25 miles from the border also make it a little more likely that, in fact, something was going on when we know how many illegal immigrants come across the border all the time and that this was their job, these two officers or three officers? There's a whole catalog of concerns I have about the meeting, and I'm one of those people who doesn't take lightly the Fourth Amendment. So I just have a number of problems with whether there was reasonable suspicion or not. But I'm glad to go on to sentencing. Well, I was really glad of you picking this up, Judge, but I'll go over to sentencing. But I agree with you. I live in Arizona. I've lived there for 34 years, and I'm very, very troubled. Essentially, by the time we're whittling away, and I understood this Court had its opinion, our view, so I agreed with you all for what it's worth. But the Supreme Court didn't agree with us. But, you know, it's just almost if you live in southern Arizona, you're a suspect. Clearly, if you drive a car from Phoenix to this area, you're in big trouble. A truck. A truck. A truck. So minor participant, was that what we were going to do? Yes. You're switching gears. Thank you, Your Honor. Judge, I do think Mr. Taibash should qualify as a minor participant in this case. There's this cover-up case, which seems to say that if he doesn't admit that he was, in fact, involved and he has to put on evidence. I mean, there was evidence here that there obviously were a bunch of other people involved. I agree. And what did the district court say about that? Judge Rohl called Mr. Taibash an average participant. I believe that's the word he used. And Judge Rohl had trouble because he said, well, where do I draw the line? That was in the sentencing transcript. I can't tell you the page. But he said, well, where do I draw the line? He's driving them, and there's other people involved. And so where do you decide that his participation is minor? My argument was, and I think this Court appreciates, that if the trial court was allowed to bring up the fact that they used expert testimony at trial to fill in the blanks and have an expert come in and say, here's how smuggling operations are done and here's why you didn't find any money and so on and so forth, I don't believe the government should turn around then and say, now you can't argue minor participant because there's really not that many people involved. On the one hand, the government tried to describe that there must have been numerous people involved to explain to the jury why the money was never found in Mr. Taibash and so forth. And on the other hand, in sentencing they're saying he's not a minor participant. The definition of minor participant is a person who is less culpable than most other participants, but his role could not be described as minimal. And I believe that's this case. We're not saying Mr. Taibash was not involved. We're saying he was involved, but he's basically driving a short distance. We have no idea how far he went. Yeah, where was he going? We don't know. We don't know, but I believe the material witnesses thought they were getting a ride to Phoenix. I believe that's what they thought. And then from Phoenix they would end up in stash houses. One was going to end up in South Carolina. And how far was Phoenix from? I think Phoenix is three hours, like 150 miles. It's not a short distance. It's not a short distance. An important trip for him. Well, but if you look at everybody that's involved, and I delineated just some of those players in my motion, you have the people in Mexico who are soliciting and involving these people in crossing the border. They're point people. They then hook them up with another point person who has to drive them all the way to the Mexican-American border to start the truck through the desert. You then have a coyote, who, by the way, they let go in this case and deported. You have a coyote who walks with them through the desert and endangers their lives. Then the coyote parks them. Then you have a person who usually takes them what is probably one of the shortest distances in the scheme of the whole conspiracy, if you will, for profit, which would be takes that individual all the way to or, I'm sorry, takes the individual to usually Phoenix. But from Phoenix there have to be separate people that then use stash houses. They have to employ additional drivers to get them all over other areas of the United States. And then they also pay all these people if they're being paid. So my argument is that, okay, if you want to say Mr. Tayabas was not entitled to do this under my necessity argument, then we're not saying he's not culpable as far as transporting the aliens, but we are saying that in the scheme of the level of operation that the government would have the jury believe in order to bolster their evidence for profit because there was no actual proof of any money exchanging hands, well, then in that case you would have to say Mr. Tayabas' role was minimal. And in these particular facts, because he drove a short distance.  TAYABAS. Your Honor, I'll save your time for rebuttal. MS. TAYABAS. Thank you. MR. FERGUSON. May it please the Court, my name is Bruce Ferguson, Assistant to the United States Attorney. On behalf of the government in this case, obviously most of the questioning in the prior discussion has gone to reasonable suspicion for the stop. And I think that we can look at the record that was developed and found by the magistrate judge and see that there were at least nine factors or probative points which supported exactly what happened here. First of all, as Judge Baer pointed out, we're dealing with a particular location which is close to the border, about 20 to 25 miles. MS. TAYABAS. Well, given the fact that there's virtually nothing in between, it's close for these purposes. The testimony was that it was quite frequent for the people to basically walk across. MR. FERGUSON. From the compound to the border, is there a road? MR. FERGUSON. There apparently are trails which are commonly used for exactly this kind of immigrant traffic across that area. MR. TAYABAS. There are.  FERGUSON. And it's in the record? MR. TAYABAS. There was testimony from, at this point I'm not sure if it was Antone or Robledo, but they mentioned that there are these fairly well-established trails that are used for this purpose. But obviously we're not talking about Phoenix or Tucson or someplace that's a great distance away. So that's the basic context. Secondly, as was talked about, this truck came out of the Martinez complex, and Ranger Antone, who was a resident himself of the reservation, lived there for 40 years and knew who has what, said that nobody there owns a truck, which is not surprising because he also was aware that out of the six or eight people who lived there, only two were employed. So this is not a situation where they have a lot of vehicles available. MS. TAYABAS. They're employed. They must have driven it. He said they didn't own cars. But the whole thing about the Martinez complex, just for a law enforcement purpose, they should think that if they know that this is a place where there are always illegal aliens, that they would deal with that, that they would assist. MR. WARREN. Well, the testimony from Antone and Robledo was that they had assisted in some operations with regard to illegal aliens. I believe Ranger Antone talked about one in particular where there was a group of 15 that had been taken into custody. But the problem is that that is not a tribal responsibility. That is basically the federal government's responsibility, and they have checkpoints on the two major roads which cross the border on either side of the reservation. But it's really not a tribal responsibility to be enforcing immigration law. And so they obviously keep track of that. MS. TAYABAS. The downside of proceeding this way is that anybody driving around near that compound with a non-local license plate is going to get stopped automatically, pretty much. I mean, there wasn't really much else. You say there were nine things. I mean, you had a truck. Trucks carry heavy things, so that's not worth a lot. It's because it was an out-of-state license plate and it was near this place. MR. WARREN. It's because this was such an isolated place, much like the isolated back road in Arvizu, that it had particular significance. We're not talking about San Francisco or Tucson or Phoenix. The Martinez Complex apparently is on this little dirt road, a little spur, which comes off of Federal Route 16, which goes across. But even FR-16, the testimony from both Antone and Robledo was that it's basically used only by local traffic. There is no legitimate reason for non-residents to be down there. There is not even specific testimony about that, although there are places on the reservation where people come on to do, for example, construction work. There was specific testimony that there was no construction work being done in this area. So there was no apparent legitimate reason for this vehicle, with a registration 100 miles away, to be in this back road area. And so, again, we're talking about reasonable suspicion, and I think that's important. In a reply brief, it may have been a slip, but defense counsel talked about probable cause. We're not talking about probable cause. We're talking about reasonable suspicion. Yes, but it's still a very low standard. It's not – it's considerably less than a preponderance, the Supreme Court said. And this Court in the Murdoch said that if the district court's finding is plausible, the reviewing court cannot reverse, even if it would have found or would have weighed the evidence a little differently. So we're just talking about is it plausible under the totality of the circumstances for the agents or police officers and the district court. You're essentially arguing that – forget the Martinez complex. If you had a Phoenix, a car with a Phoenix license plate driving around this area, it could be stopped, a truck that looked maybe a little heavy. Well, again, we have to talk about the totality, so you remove any one factor and it would make a difference. No, the Supreme Court has said that. I don't know what it means. It doesn't mean anything to me. It would be less probative in the absence of the particular location where it was found, but it still has considerable weight because of the factors that, for example, Judge Pines was talking about before. We're not talking about just in general off the reservation. We're talking about a particular area, Maricopa County, the town of Maricopa, which is near Phoenix, which is in Maricopa County. It's a little confusing, but it's 100 miles away, but this is a place where there is a frequent source of illegal traffic, both the stolen vehicles being brought onto the reservation, I assume for transport into Mexico, plus, going the other way, illegal aliens and drugs in great quantities. What do we do about these contradictions that we heard about and are in the record? I mean, one, for instance, it talks about Anton's testimony, having personally observed illegal activity, and how over a seven-year period he had been involved with 30 incidents, et cetera, et cetera. And the 15 of them had been transportation of undocumented aliens, and another 15 involved illegal aliens. I'm not sure what the difference is. One was apprehended on foot. And then he comes around totally and he says all of these facts were speculative on his part. Two considerations here. He ends by saying that it was all three times a week. I think that's part of the reason why I put the entire suppression hearing record or transcript in the record, so that you could actually see, if you would, the quality of his testimony. And basically, without in any way denigrating him, he was not a good witness, simply given his apparent level of education. And I found, as he apparently did, difficulty in following some of the questions that were being asked to him, which were frequently phrased into negatives or even double negatives. And so he was ending up trying to answer questions that he apparently did not fully understand. I couldn't tell whether there was a transcription error often. I mean, his sentences were strange. Yes, this was one where it was transcribed off of an audio tape, apparently, rather than by a court reporter directly. So there were problems there, and they couldn't ask questions to clarify things. So there was that problem. But as I pointed out, and there's a footnote, and I can't tell you the page, but it's in my brief, the only real inconsistency was the question of how many of these illegal aliens he had personally observed. And it didn't, under cross-examination, become clear that he apparently initially had been talking about how many incidents generally that he was aware of. And then when counsel began questioning him under cross-examination about, well, how many were you really involved in, that's when it was brought out that there were fewer than that. But the main point is that the general reputation amongst the law enforcement, which was not only Antone, but also what he was receiving from his dispatchers and from his contacts with the Border Patrol, and which Sergeant Robledo also shared in, was that this was an area where this kind of criminal activity existed. This particular compound of house? Yes. So why, I mean, why doesn't somebody go and deal with that? I mean, it's really disturbing to have the fact that people, there's a group of people, apparently, eight of them, who are, it's being said everyone knows are smuggling illegal aliens, but no one seems to want to prove that. Instead, they want to stop everybody who goes by in a Phoenix car. Well, I can go into some things that are not on the record, but that is not something that you can rely on, as far as other prosecutions that relate to this area and so forth. But, again, this Court is, I'm sure, you know, you can take notice of how stretched our whole resources are. They're about to give us, I think, 15 more lawyers in the Tucson office, for which we'll be grateful to handle the cases. It's just that, I mean, the price of it is that people, a lot of perfectly innocent people driving around that area are going to get stopped. Well, there are not a lot of innocent people driving around this remote area. That was the whole point. You have some local residents, many of whom are involved in the traffic, and you have this location. You know, the ordinary cross-reservation traffic for people who are not members of the tribe is not even FR-16, it's Highway 86, a major thoroughfare. So we're way off the beaten path for anyone. But, again, when we're getting to the actual stop, you know, this is all kind of preliminary. We've got to remember that we have not only the registration in this source area of criminal activity, but what did Sergeant Robledo see? He saw a heavily overloaded small truck with only, so far as he could tell, two people in it. And he's also well aware of, you know, what kinds of legitimate things can be in a vehicle. Well, it could have dirt. Could. But he also ---- Yeah, for sure. He was specifically ---- Cement bags. Possible. But he specifically testified ---- Where did he go? Pardon me? What prompted you to let the fiancé go? I was ---- I thought she was going to help you, but it didn't happen. I have no idea. I've got this on appeal, and I don't know what the charging stations were. It's the U.S. Attorney. Pardon me? Nothing. Yeah. Unimportant. Go right ahead. So when Sergeant Robledo was looking at this truck, and he specifically testified about positioning himself so that he could look through the windows, which were not heavily tinted, and so he's aware that there are legitimate purposes. And he said, usually when that happens, I can see something. I can see a pile of sand or bags of cement or something. But he could, even in his somewhat elevated SUV, down into this little truck ---- It doesn't make a whole lot of sense because, you know, then he should have been able to see the people in it. I mean, if he could see down to the ---- Well, the testimony was that they were lying ---- At some level. He could obviously only see down to some level because he didn't see them. They were lying prone in the bottom. In two layers, as I understand it. Well, I'm not sure how many layers because there were three in the ---- That's what it said. Extended cab, which, you know, no, it's the back of the cab, and then there were, I guess, six more side by side, squished together in the truck bed. They said that they were on top of each other. Yeah, that was my understanding. What kind of truck was it? I think the testimony was it was a small one, an S-10. So we're not talking about a large heavy duty truck. A what? I'm sorry? An S-10. An S-10. Is that Ford? I think it's a Chevy, but I'm ---- Chevy S-10. I'm not an auto ---- That's a minor participant issue. I'm sorry? That's a minor participant sentencing issue. I'm sorry? Minor participant sentencing issue. Okay. Got you. Minor role. Well, his own defense puts him in a difficult position because he's basically saying, I wasn't a participant, but I just picked up these people ---- I don't really understand that because that's true of a lot of things that go on in sentencing, right? I mean, that was his defense before, but now he's in sentencing. He did not testify at sentencing. But it doesn't ---- whether he did or didn't had nothing to do with what his defense was originally. Well, the ---- I know we have a case that says that. It doesn't make any sense to me. There are lots of things that go on in sentencing that require ---- I mean, you have somebody saying, you know, it wasn't my drugs. Then he put them ---- he still has to decide how much drugs it was. Well, I guess there's a ---- the question is, how can you say I have a minor role when you're saying I don't have a role? But he wasn't saying that at that point. He was saying it during the trial, but he isn't saying it now. Well, assuming ---- so we have an inconsistency in his whole approach. But I'm saying that happens all the time after a trial with regard to sentencing, in all kinds of areas, doesn't it? Okay. Let's go at it that way. The burden of proof is on him. He has to show that he's entitled to this reduction. And it has to be more than just saying that's where I was. And that was the problem that Judge Rohl had, is that he presented absolutely nothing to verify. We have a list that your opposing counsel has provided of all the people that, if you read the transcript, you can know were involved in this, the people who they made arrangements with and the people who they paid and the people ---- and the guide and so on. We know there are a number of other people. Well, that's where you're getting into speculation because you're saying ---- That's speculation. We know from the evidence of the people who were the material witnesses that they dealt with a bunch of people before they got to this guy. And that is how this kind of a thing normally works. But here's the question. There was a government expert witness who said this. That's right. Okay. So can he rely on the record? He very carefully did what this Court says and didn't try and draw any particular conclusions about this case. But he talked about modus operandi, yes. Okay. So why isn't that and the record evidence about the various people who were involved enough to allow the judge to say, I mean, either he is or isn't, doesn't have a minor role? Because, first of all, what you're talking about is how can the transporter, the one that we know is actually carrying people in a transportation case, be having a minor role? Now, you can, if you wanted, the guideline commentary indicates that you're basically supposed to draw a comparison. What does the whole operation look like and how does this guy fit into it? And we can say, yes, there are these people out there, but we really have no evidence. The only reason he only got four miles is because he was stopped. He was on his way to Phoenix, which is 100 miles. What? That's not a minor role. I mean, I don't have any difficulty saying on this record that he was going to drive 100 miles and there were other people who were the people who made arrangements with the people who were being carried and there were other people who they were going to pay and there was a guide who was another person. I mean, that's all clear from the record. Now, whether you characterize what his role is minor or not may be a judgment call, but it's not at all to say that we don't have a record. It's not so. There's a record. Well, I think what Judge Rohl was saying is that he didn't carry his burden of proof to show that his role was that minor compared to everybody else, which is reviewed only for clear error. Judge Rohl seemed to be saying that he couldn't say there was anybody but him, but that's not true. We know there are other people. We know basically who they were. We even have some names and we have a pretty good idea what they were doing. So what's the problem? Well, for example, this Court's case law, and the name of the case is escaping me, but it was an alien case, and I cited in my brief, pointed out that just because you are a courier either of drugs or aliens, the one who's caught driving the goods, doesn't mean that you're entitled to a minor role. And that basically is what the argument is, because the person who actually does the transportation of the goods is a vital link. That isn't what Judge Rohl said. That's my point. He didn't say, I've looked at the whole group of people and I've decided he has a minor role. He's saying, I'm not looking at any group of people. He said, you, defendant, have not carried your burden of showing that your role was less than other people, which is what the legal requirement is. Didn't he say somebody had an average role or something? He had an average role? He was an average player or something? That's what Judge Rohl found, is that he was at best an average. And it was up to the defendant to show more specifically what these other people did, because in the abstract, how do you judge whether taking the money eventually or being the contact point, if we really want to have a minor role, apparently there was some indication that the material witnesses were talked to by someone on the phone who directed them to go someplace. If anything, that is a more minor role than the guy who's actually driving the truck. So comparatively, it would seem like Judge Rohl was certainly within the bounds of clear error to say, you haven't shown me that you were minor in this. You were average at best. Hernandez-Franco, I did have this citation here. The defendant must show that he was substantially less culpable than the average co-participant. That's his burden. And he simply didn't do it. He said, well, there are these other people out there, but he didn't go that far. The other sensing issue was a matter of acceptance of responsibility. He simply did not accept responsibility, no matter how you slice it. On the one hand, he was saying initially he really didn't do anything at all, and then later he said, well, after I got him in the truck, they told me they were illegal, but I was doing it because they were in distress, and the district court specifically found that that was not supported by the record. In any event, if we look at the pre-sentence report, his final chance to have a word because he did not testify, PSR paragraph 9 says, the defendant stated he is innocent and that he felt that he was railroaded. No acceptance there. So unless there are other questions or issues. I don't see any. Thank you. I believe you had about a minute for rebuttal. As to minor role in this particular case, these issues are not mutually exclusive in acceptance of responsibility or minor role. Mr. Tayabas did maintain always that he drove these people. Initially he thought they were just some distressed people. When he opened the door and let them in, the other people, according to him, came in and at that point he realized, okay, these are illegals. But he still thought they were distressed. The problem here is the for profit. What he admitted to is, yes, I drove these people. Yes, I discovered that they were illegal aliens. But what he disputed was I didn't do this for profit. And that also goes to the issue of minor participant. On the one hand, Judge Rohl acknowledged, and we acknowledged, the evidence at trial was basically you had a coyote that you knew about for sure and Mr. Tayabas, and so the analysis of the government, well, there's only two people, and so you're more than a minor role. You're half the operation essentially. And then Judge Rohl went ahead and made the record that, well, where do you draw the line? And he went down the list of delineating all the people that may be involved in this. I don't believe if one raises a necessity defense that it's necessarily mutually exclusive to say you cannot have acceptance of responsibility where we put on evidence with a witness of a necessity defense, even though the jury chose not to acknowledge it. It's a different mens rea about this gentleman's own acceptance of responsibility. He always said that, yes, he did drive them. When he first picked them up, he told the agents at the scene that he just told them, you'll be okay. I mean, that was pretty much he didn't want to talk after that. But that's also what the alien said. He just said, you'll be okay. It's supported that he might have been rescuing people in distress, even though the jury didn't buy it. So I do believe there was evidence to support not only minor role, but the enhancement issue. And thank you for your time. Thank you. Thank you, counsel. We appreciate your arguments. The matter will be submitted, and that ends our session for the day. Thank you.
judges: Paez, Berzon, Baer